**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **INTERNATIONAL ASSOCIATION OF SHEET METAL AIR RAIL TRANSPORTATION WORKERS,**<br><br>**Petitioner/Counter-Defendant,**<br><br>**v.**<br><br>**OFFICE AND PROFESSIONAL EMPLOYEES INTERNATIONAL UNION, LOCAL 2,**<br><br>**Respondent/Counter-Claimant.** | **Case No. 26-cv-00364 (APM)** |

**MEMORANDUM OPINION AND ORDER**

**I.**

Petitioner International Association of Sheet Metal Air Rail Transportation Workers ("SMART") terminated employee Alphonso Smith after he sent an email to his coworkers comparing one coworker's remote work accommodation to retirement. His union—Respondent Office and Professional Employees International Union, Local 2 ("OPEIU")—brought a grievance under the parties' Collective Bargaining Agreement ("CBA"), and Arbitrator Timothy Taylor ordered Smith's reinstatement. SMART refused to do so, however. Instead, it filed a petition with this court to vacate the Arbitration Award ("the Award"). *See* Pet. to Vacate, ECF No. 1 [hereinafter Pet.]. OPEIU counterclaimed to compel compliance. *See* Answer to Pet. and Counter-Compl., ECF No. 8 [hereinafter Answer].

Before the court are SMART's Motion for Summary Judgment, *see* Mot. for Summ. J., ECF No. 13 [hereinafter Pet'r's Mot.], and OPEIU's Cross-Petition for Enforcement,

*see* Combined Opp'n and Resp. in Supp. of Enf't Award, ECF No. 14 [hereinafter Resp't's Pet.]. For the reasons that follow, the court denies SMART's Motion for Summary Judgment and grants OPEIU's Cross-Petition for Enforcement.

**II.**

The court begins by recounting Smith's employment and termination and then turns to the Award and the present litigation.

**A.**

SMART hired Smith as an administrative assistant in 2018. Pet'r's Mot., Ex. B, ECF No. 13-4 [hereinafter Award], at 4. In the spring of 2020, and in response to the COVID-19 pandemic, SMART adopted a remote work policy. *Id.* Over the next three years, SMART issued Smith three warnings, in increasing severity, for "various work issues such as logging in late, missing mandatory remote meetings, and inconsistent work production." *Id.* First, he was verbally warned and placed on an "improvement period." *Id.* A year later, he was given a written warning and was ordered back into the office two days per week. *Id.* at 5. Ultimately, on January 27, 2023, he received "a final warning" and was directed to come into the office five full days per week. *Id.*

Two months later, the rest of the SMART staff also returned to the office full-time, with one exception: Lynn Mutispaugh. *Id.* She "had requested, and been granted, continuation of her full-time work-from-home status as an accommodation for a documented medical condition." *Id.* In the ensuing months, Smith expressed discontent and resentment over Mutispaugh being permitted to work from home. *Id.* at 5–6. He also made his own request to work from home two days each week as a medical accommodation, which was ultimately approved. *Id.* At the meeting in which he made that request, Smith brought up Mutispaugh's accommodation, and

SMART House Counsel Luke Rebecchi reminded him that Mutispaugh had "a confidential medical issue that should be of no concern to" him. *Id.*

On March 30, 2024, Smith sent an email to 43 OPEIU bargaining unit members and SMART managers regarding the departure of a coworker. *Id.* at 7. Mutispaugh replied to the whole thread: "[p]lease leave me out of your emails." *Id.* at 7–8. Seven minutes later Smith retorted, copying all 43 coworkers on his message: "Will do. Enjoy your retirement working from home! Be blessed." *Id.* at 8.

That was the last straw. Two days later, on April 1, 2024, SMART terminated Smith's employment. *Id.* at 10–12. It informed him that his mass email denigrating Mutispaugh's medical accommodation "tend[ed] to create a hostile working environment for employees with disabilities" and thereby constituted a "violation of SMART's Discrimination and Harassment Policy." *Id.*; *see also id.* at 3 (stating that SMART had in place a policy prohibiting "unlawful discrimination and harassment in the workplace" including on the basis of disability). The termination email also noted that, only six weeks earlier, Smith had been warned that he "needed to treat other employees with respect." *Id.* at 12.

**B.**

During this period, SMART and OPEIU were party to a CBA, which provided for the arbitration of grievances arising from the discharge of an employee. *Id.* at 1–2. The agreement required that SMART "not discontinue the employment of any employee except for just and sufficient cause." *Id.* at 2.

On April 4, 2024, OPEIU filed a grievance under the CBA challenging Smith's termination. *Id.* at 12. Arbitrator Timothy Taylor conducted two hearings in 2025 to determine whether there was just cause to terminate Smith and, if not, the proper remedy. *Id.* at 2. SMART

argued that there was just cause for Smith's termination because his email was a "meanspirited denigration of Mutispaugh's disability status," he had received several warnings about being disrespectful toward his co-workers, and his job performance was "less than satisfactory." *Id.* at 12. OPEIU countered that Smith's conduct did not "rise to the level" of violating SMART's anti-harassment policy and urged the Arbitrator to consider only evidence related to the alleged policy violation, not other performance-related evidence. *Id.* at 12–14.

The Arbitrator issued a mixed decision. He determined that Smith's email indeed violated SMART's anti-harassment policy by creating a "hostile and offensive work environment." *Id.* at 16–17. Specifically, he found that Smith intended to "denigrate [Mutispaugh's] status as an employee receiving an accommodation due to a disability," *id.* at 16, and that the email "created a hostile work environment in which co-workers constantly wondered whether [Mutispaugh] was properly performing her duties or spending her time watching soap operas," *id.* at 14. The Arbitrator also "called into serious question" Smith's credibility in attempting to innocently explain away the email. *Id.* at 16.

Notwithstanding these findings, the Arbitrator sustained OPEIU's grievance, concluding that Smith's termination was "too severe a penalty under all the circumstances of this case." *Id.* at 17, 20. The Arbitrator described the "harm caused by sending the email" as "not particularly serious." *Id.* And he observed that, although Smith's time working at SMART "ha[d] been marked by significant disciplinary issues," he "ha[d] demonstrated the ability to perform assigned tasks competently." *Id.* at 17–18. The Arbitrator ordered SMART to reinstate Smith to his former position within fourteen days. *Id.* at 18, 20. He declined, however, to award back pay, and he required that Smith's employment record note that the 21-month period between his termination and reinstatement "constitute[d] an unpaid disciplinary suspension." *Id.* at 20. He also ordered

that Smith's employment record remain as it was prior to his termination, reflecting "his status as an employee who has already received a final warning about his job performance." *Id.* at 18, 20.

SMART did not reinstate Smith as directed. Resp't's Pet., LCvR 7(h) Resp. and Stmt., ECF No. 14-1, at 10. Instead, nearly one year later, it petitioned this court to vacate the Award on the sole basis that it "conflicts with the well-defined and dominant public policy against disability discrimination in the workplace." Pet'r's Mot., Mem. of P. & A. in Supp. of Pet'r's Mot., ECF No. 13-1 [hereinafter Pet'r's Mem.], at 6; *see also* Pet. at 4. OPEIU answered and raised a counterclaim for Breach of Collective Bargaining Agreement under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Answer ¶¶ 9–23. SMART then filed a Motion for Summary Judgment, *see generally* Pet'r's Mot., and OPEIU cross-moved for enforcement of the Award, *see generally* Resp't's Pet.

**III.**

Labor arbitration awards are reviewed under an "extraordinarily deferential standard." *Nat'l Postal Mail Handlers Union v. Am. Postal Workers Union*, 589 F.3d 437, 441 (D.C. Cir. 2009). "[A] labor arbitrator's decision must be upheld so long as it 'draws its essence from the collective bargaining agreement.'" *Id.* (quoting *United Steelworkers of Am. v. Enter. Wheel & Car Corp.*, 363 U.S. 593, 597 (1960)). Thus, "even if [a] court is convinced the arbitrator committed 'serious error,'" the court may not overturn his decision so long as the arbitrator "arguably constru[ed] or appl[ied] the contract and act[ed] within the scope of his authority." *Id. (*quoting *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62 (2000).

There is an exception to this deferential standard: "courts will not enforce an arbitration award if the award itself violates established law or seeks to compel some unlawful action." *Am. Postal Workers Union, AFL-CIO v. U.S. Postal Serv.* (*Postal Workers*), 789 F.2d 1, 8

(D.C. Cir. 1986). This "public policy exception" is "*extremely narrow*." *Id.* For it to apply, the policy "must be 'explicit,' 'well defined,' and 'dominant,' and it must be 'ascertained by reference to the laws and legal precedents, not from general considerations of supposed public interests.'" *E. Associated,* 531 U.S. at 62 (quoting *W.R. Grace & Co. v. Local 759, Int'l Union, United Rubber, Cork, Linoleum & Plastic Workers*, 461 U.S. 757, 766 (1983)). The public policy exception does not give judges "license to impose their own brand of justice in determining applicable public policy; thus, the exception applies only when the public policy emanates from clear statutory or case law." *Postal Workers*, 789 F.2d at 8.

**IV.**

SMART seeks to vacate the Award on the sole basis that it violates the "public policy against workplace discrimination" by ordering Smith's reinstatement "without any rehabilitative findings or conditions." Pet'r's Mem. at 2, 7. The court is not persuaded.

The D.C. Circuit has said that the public policy exception applies only where "the award itself violates established law or seeks to compel some unlawful action." *U.S. Postal Serv. v. Nat'l Ass'n of Letter Carriers, AFL-CIO (Letter Carriers)*, 810 F.2d 1239, 1241 (D.C. Cir. 1987) (internal citation and quotation marks omitted). The Circuit's cases illustrate the restricted scope of the exception. In *Northwest Airlines, Inc. v. Air Line Pilots Association, International*, for example, the court declined to overturn an award that reinstated a pilot discharged for drinking alcohol between flights, contingent on his recertification by the Federal Aviation Administration. 808 F.2d 76, 83 (D.C. Cir. 1987). The court recognized that the airline had "an interest in applying reasonable safety rules to its pilots" but refused to upset the arbitrator's decision because reinstating the pilot "plainly [was] not unlawful." *Id.* Later, in *Letter Carriers*, the court reviewed an arbitration award that reinstated a letter carrier who had pleaded guilty to unlawfully delaying

the mail. 810 F.2d at 1240–41. It, too, declined to vacate the award because the employer failed to "identify any legal proscription against the reinstatement of a person such as [the employee]." *Id.* (internal quotation marks omitted); *see also Postal Workers*, 789 F.2d at 8–10 (declining to overturn award, even though the arbitrator may have misapplied the *Miranda* decision, because "embrac[ing] the employer's argument . . . would be to run the risk of allowing an ill-defined 'public policy' exception to swallow the rule in favor of judicial deference to arbitration"); *cf. Nat'l R.R. Passenger Corp. v. Fraternal Ord. of Police, Lodge 189 Lab. Comm.*, 855 F.3d 335, 340–41 (D.C. Cir. 2017) (vacating arbitrator's award under the Railway Labor Act because it enforced an "illegal contractual term").

Applying *Northwest Airlines* and *Letter Carriers*, the outcome here is straightforward: the public policy exception does not apply because Smith's ordered reinstatement is neither unlawful nor seeks to compel unlawful action. SMART cites no clear statutory authority or case law that would prohibit an employer from reinstating an employee found to have engaged in disability discrimination. Instead, invoking anti-discrimination statutes generally, SMART argues that requiring Smith's reinstatement would "subject[] other SMART employees to an unacceptable likelihood of further harassment" and prevent it from maintaining a respectful and hostility-free workplace. Pet'r's Mem. at 2. But such misgivings, even if justified, are not enough. As the Circuit's decisions demonstrate, even concerns about reinstating a pilot suffering from alcoholism to a position where he would again fly planes, *Northwest Airlines*, 808 F.2d at 83–84, or a mail carrier who pleaded guilty to unlawfully delaying the mail to a position where he would again deliver mail, *Letter Carriers*, 810 F.2d at 1240–41, are not enough to undo a reinstatement award. SMART's worries about returning Smith to the workplace are understandable. But they are not enough to overcome the Arbitrator's award.

SMART responds that cases like *Northwest Airlines* and *Letter Carriers* are inapt because they do not "involve[] discriminatory harassment of co-workers" or "reinstatement devoid of any rehabilitative conditions." Pet'r's Mem. at 10. But application of the public policy exception does not turn on the type of employee behavior that triggered termination. To fit the public policy exception, there must be a "legal proscription against the reinstatement of a person such as the grievant." *See Postal Workers*, 789 F.2d at 8. None exists here. Nor does it matter that the Arbitrator did not place SMART's preferred conditions on Smith's return to work. *See* Pet'r's Mem. at 2 (identifying a series of conditions that were not imposed, such as anti-harassment training). The public policy exception does not permit a court to reject or re-engineer an unconditional reinstatement award based merely on the employer's dissatisfaction.

SMART also urges this court to look past precedent in this Circuit to out-of-circuit case law, passing references to the Americans with Disabilities Act (ADA), and language from the Supreme Court, which it characterizes as collectively setting forth the obligation of employers to "exercise[] reasonable care to prevent and correct promptly any [discriminatory] behavior." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *see* Pet'r's Mem. at 2, 7–8. It contends that this patchwork of authorities establishes that the "public policy against workplace discrimination prohibits the reinstatement of an employee who created a hostile work environment in [the] absence of a finding that the grievant is or will become rehabilitated." Pet'r's Mem. at 7 (emphasis omitted). The court disagrees.

To begin, SMART relies heavily on two out-of-circuit cases, which it describes as "the leading cases on when the reinstatement of a grievant who created a hostile work environment violates the public policy against workplace discrimination." *Id.* at 8 (citing *Newsday, Inc. v. Long Island Typographical Union, No. 915, CWA, AFFL-CIO*, 915 F.2d 840 (2d Cir. 1990);

*Stroehmann Bakeries v. Local 776, Int'l Bhd. of Teamsters*, 969 F.2d 1436 (3d Cir. 1992)). In *Newsday*, the Second Circuit vacated an award for violating public policy where the employee "ignored repeated warnings" to stop sexually harassing coworkers. 915 F.2d at 845. And two years later, the Third Circuit in *Stroehmann* vacated an award because it "reinstate[ed] an employee accused of sexual harassment without a determination regarding the merits of the allegation . . . ." 969 F.2d at 1438.

Neither case compels a different result here. As an initial matter, these cases rely on standards that are less demanding that the D.C. Circuit's. Instead of asking whether the reinstatement itself is unlawful or compels unlawful action, they ask whether it "explicitly conflict[s] with well-defined, dominant public policy," *id.* at 1441, or is "contrary to public policy," *Newsday*, 915 F.2d at 844. This court is bound by the D.C. Circuit's more rigorous formulation. *See Exxon Shipping Co. v. Exxon Seamen's Union*, 993 F.2d 357, 363 (3rd Cir. 1993) (observing that the D.C. Circuit holds that "an award only violates public policy where it contravenes a rule of positive law which forbids reinstatement of the employee" and differentiating it from the "broader approach" in other circuits).

*Stroehmann* and *Newsday* are also unpersuasive, given that they are distinguishable on the facts. Unlike *Stroehmann*, where the arbitrator failed to assess the merits of the harassment allegations, 969 F.2d at 1438, the Arbitrator carefully did so here and concluded that Smith's conduct did not warrant termination, *see* Award at 14–17. And contrary to *Newsday*, where the employee was subject to "repeated warnings" about sexual harassment, *Newsday*, 915 F.2d at 845,

here, Smith received warnings about his job performance, not about discriminatory or harassing conduct, Award at 4–6.[1] *Stroehmann* and *Newsday* are thus inapposite.

SMART next points to *Ellerth* and the ADA for support. But it does not explain how those sources of law proscribe Smith's reinstatement either. It asserts that "employment anti-discrimination statutes like Title I of the [ADA], 42 U.S.C. §12111 *et seq.* establish a public policy against workplace discrimination and hostile work environments, and in favor of employers 'exercis[ing] reasonable care to prevent and correct promptly any [discriminatory] behavior.'" Pet'r's Mem. at 7 –8 (citing *Ellerth*, 524 U.S. at 765). However, the quoted language from *Ellerth* merely describes an element of an employer's affirmative defense to vicarious liability for a Title VII hostile work environment claim. *Ellerth*, 524 U.S. at 745. It cannot bear the weight of demonstrating that Smith's reinstatement would be unlawful or compel unlawful activity. Neither can the ADA. It does not contain a "legal proscription against the reinstatement of a person such as [Smith]" who harasses a colleague with a disability. *See Postal Workers*, 789 F.2d at 8.

The court is not unsympathetic to SMART's concerns and desire to create a workplace free of discrimination. But it is not the role of the court to "impose [its] own brand of justice in determining applicable public policy." *Id.* Because SMART has not identified any statute or case law which makes it unlawful for it to reinstate Smith, its public policy challenge fails. The court therefore confirms the Award.

---

[1] Rebecchi did tell Smith that Mutispaugh's accommodation "should be of no concern to" him in a private meeting, Award at 6, but that is far different from the express warnings provided to the grievant in *Newsday*, 915 F.2d at 842–43, 845; *see also* Pet'r's Mem. at 9 ("Subsequent cases applying *Newsday* have emphasized that the doctrine generally does not apply unless the grievant refused previous warnings or disciplinary actions.").

## V.

For the foregoing reasons, Petitioner's Motion for Summary Judgment, ECF No. 13, is denied and Respondent's Cross-Petition for Enforcement, ECF No. 14, is granted.

In its Cross-Petition, Respondent requested both enforcement and an "award [of] appropriate remedies against SMART for failure to comply with the Award." Resp't's Pet. at 11. It did not, however, specify the "appropriate remedies" sought. Its Counter-Complaint asks for back pay from the date of the Award, prejudgment interest, and attorney's fees. Answer at 8. Neither party, however, has briefed these proposed remedies. The parties shall file a Joint Status Report by November 20, 2026, which advises whether any dispute remains as to these additional remedies and, if so, proposes a schedule for further proceedings.

Dated: November 13, 2026

Amit P. Mehta
United States District Judge